**IN THE DISTRICT COURT OF THE UNITED STATES**
**FOR THE DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | Cr. No. 07-022S |
| v. | : | |
| | : | |
| ANA MARIA SANTI | : | |

MEMORANDUM IN AID OF SENTENCING

Comes now the United States of America, by and through undersigned counsel, Assistant U.S. Attorney Adi Goldstein, and submits the following Memorandum in Aid of Sentencing in support of the United States' recommendation that the Court impose a sentence of incarceration that falls within the guidelines range of sentences under the United States Sentencing Guidelines (U.S.S.G.) as set forth in the Presentence Report.

I. Introduction

Defendant Ana Maria Santi (Santi) pleaded guilty to Counts 1-29 of the 80-Count Indictment on July 13, 2007. At her change of plea hearing, Santi admitted to engaging in a long-term conspiracy with Daniel McGlone of American Pharmaceutical Group (APG), and other individuals, named and unnamed, to distribute human Growth Hormone (hGH) and anabolic steroids. Santi admitted that she wrote prescriptions for 81% of APG's customers, about 392 people throughout the United States. From 2004 until the summer of 2006, Santi wrote about 100 prescriptions a month for APG customers alone. In total, she wrote prescriptions for well over 40,000 units of anabolic steroids and hGH. As set forth in her plea agreement, Ms. Santi also admitted to writing approximately the same volume of prescriptions

for other companies such as MetraGen (previously known as Powermedica), Infinity Rejuvenation, Oasis Longevity, and Advance Therapy. In other words, Santi admitted to facilitating the distribution of drugs to hundreds, if not thousands, of people throughout the country.

Santi issued the prescriptions under the name and DEA registration of Dr. Abdul Almarashi - - a retired (and now deceased) physician who resided in a California nursing home during the relevant time period. Dr. Almarashi had no doctor-patient relationship with any of defendant's customers. Santi, whose own medical license had been revoked in 1999, never met, spoke to, or diagnosed any of the customers for whom she wrote prescriptions. She had no doctor-patient relationship with any of the customers; did not review their medical records; and had no way of truly knowing such basic information as their age, medical history, and true physical condition. There can be no doubt that there was no medical aspect to Santi's conduct – it was done purely for pecuniary gain.

In addition to unlawfully distributing steroids, hGH, and other prescription drugs, Santi, on more than one occasion, wrote fraudulent letters to insurance companies such as Blue Cross Blue Shield of Rhode Island. In these letters, she represented that the prescriptions were issued in the course of providing medical treatment and that they were medically necessary. As a result of these letters, insurance carriers reimbursed third parties for fraudulently issued prescriptions.

Taking into account various factors such as (1) drug quantity, (2) financial gain, (3) abuse of position of trust, and (4) acceptance of responsibility, the PSR arrived at a Total Offense Level of 19. The PSR determined Santi's Criminal History Category to be Category III. The resulting guidelines range was therefore 37 to 46 months. Neither party objected to the PSR's guidelines

calculations.

II. Consideration of the Factors Enumerated in 18 U.S.C. §3553(b)

The government respectfully submits that the guidelines range in this case appropriately accounts for the factors enumerated in 18 U.S.C. §3553(b). As set forth below, given the defendant's extensive involvement in the conspiracy, the duration of her criminal conduct, her recruitment of at least one other physician, her criminal history, and prior instances of professional misconduct, the government believes that a sentence of 40 months incarceration is reasonable and not greater than necessary.

A. The Characteristics of the Defendant

Perhaps the most troubling aspect of this case is Ms. Santi's habitual disregard for the oath that she has taken as a physician. Ms. Santi's record before the State of New York Department of Health, Board of Professional Medical Conduct ("the Board") provides a disturbing picture of a physician who has not only ignored numerous orders to stop practicing medicine, but who has purposely misled investigators at the Board, and who has actually placed patients in harms way.

On May 2, 1994, Ms. Santi entered into a Consent Order with the Board following an investigation of allegations of drug and alcohol abuse. See Exhibits 1a-1c. As a result of this Order, defendant was placed on probation for a period of five years. Exhibit 1b. During her period of probation, Ms. Santi was ordered to remain drug and alcohol free, submit to periodic testing, and receive treatment for her substance abuse problems. Perhaps most importantly, she was only allowed to practice medicine while under the direct supervision of an "on-site" licensed physician, at a location approved by the Director of the Board. Exhibit 1c.

In 1998, the Board brought new charges against Santi alleging that she did not comply with the conditions of her probation. Exhibit 2a. The first charge provides that: "On or about and between October 1997 and March 9, 1998, at the LaFontaine-Rish Medical Associates Office . . .including but not limited to providing anesthesia services to Patient A during a procedure that resulted in the death of the patient," the defendant practiced medicine without informing the Board of her actions and without the required supervision. Exhibit 2a at p. 2. A New York Times article detailing the facts surrounding the death of Patient A is attached as Exhibit 3.

The 1998 Statement of Charges lists numerous occasions on which the defendant practiced medicine at various clinics around New York, including Crown Medical, the office of Bipin Solanki, and the office of Peter Corines, without informing the Director of the Board. The 1998 Statement of Charges alleges numerous occasions on which the defendant deliberately deceived the Board regarding her practice of medicine. As a result of these charges, the Commissioner of the Board entered an Order finding that "the continued practice of medicine in the State of New York by Ana Marie Santi, the Respondent, constitutes an imminent danger to the health of the people of this state." Exhibit 2b.

On May 11, 1998, the defendant entered into a second Consent Order with the Board in which she agreed to indefinite suspension of her license. Exhibit 2c. As part of the Consent Order, the defendant "explicitly recognize[d] that during the period of my suspension, I will not have the lawful authority to engage in the any practice of medicine in the States of New York, and . . . acknowledge[d] that any such practice could lead to both additional disciplinary proceedings and criminal prosecution for the unlawful practice of medicine." Exhibit 2c.

Nevertheless, only a month after agreeing to the suspension of her license, Santi resumed

her medical practice. On four occasions, June 22 and 24, July 28, and December 4 and 30, 1998, she administered anesthesia to patients at the office of Dr. Peter Corines. Exhibit 4a. Dr. Corines was later convicted of aiding and abetting the unauthorized practice of medicine. See New York Doctor's Aiding, Abetting Convcition Stands, Daily Record (Rochester, NY Nov. 19, 2004). Exhibit 5.

This conduct resulted in new charges being lodged against the defendant by the Board on August 11, 1999. The charges included several counts of unlawful practice of medicine and several counts of false statements to the Board. Exhibit 4a. As a result of these charges, defendant's medical license was revoked on November 11, 1999. Exhibit 4a. In addition, as set forth in Paragraph 35 of the PSR, the defendant was convicted of the unauthorized practice of medicine in Queens County Superior Court and sentenced to 5 years probation.

One would imagine that, given this history, defendant finally disengage from the practice of medicine in any form. This was not the case. While Santi could no longer perform medical procedures, she continued to engage in the unlicensed and unauthorized practice of medicine. In 2000, Ms. Santi became involved in "prescription mill" medicine. She began working with Dr. Abdul Almarashi who introduced her to numerous "anti-aging" clinics in Florida. See Exhibit 6. These clinics included PowerMedica which later became Metragen, Oasis Longevity, Advance Therapy, American Pharmaceutical Group, and others. For these clinics, she primarily issued prescriptions for anabolic steroids, hGH, and prescription drugs such as Chorionic Gonadotropin and Anastrozole. These drugs are commonly used by body-builders and athletes in "cycles" or "stacks" designed to achieve the maximum effect on muscle growth. However, in 2006, she also began working for a company known as Delta and prescribing hydrocodone to its customers.

While Dr. Almarashi may have introduced Santi to this practice, Santi essentially took it over once Dr. Almarashi retired and moved to California. The defendant simply used the name and DEA registration of Dr. Almarashi (with or without his knowledge) to conduct her business. On March 20, 2007, Ms. Santi pleaded guilty to criminal diversion of prescription medication in Albany County Court. A portion of her plea colloquy is attached as Exhibit 7.

As a person who had been licensed to practice medicine, and who had practiced medicine for over twenty years, Santi must have known the risks and dangers associated with randomly prescribing substances to individuals without a diagnosis or any type of medical oversight. Yet, she callously engaged in this practice, even though she herself had witnessed the terrible consequences suffered by patients who received various "cosmetic" treatments outside the conventional medical setting. Santi's disregard for the law is all the more astounding given the fact that she continued to write fraudulent prescriptions even after her office was searched by FDA agents in February of 2005 and she was warned to discontinue the practice. The evidence in the case shows that Santi continued to write prescriptions until the summer of 2006.

While Santi may be older than most defendants who appear before this court, her physical condition appears to be stable and her faculties are in tact. None of the factors raised by the defendant rise to a level that warrants a downward variance from the guidelines. Indeed, Santi committed these offenses with the stroke of pen, and with the use of a fax machine. Unless she is incarcerated, the government has no confidence that she will not attempt to resume this practice in the future. She could easily do so even from her own home. Thus, given defendant's history, and as will be addressed below, the seriousness of the offense, the government believes that a term of incarceration within the guidelines range is appropriate.

B. The Seriousness of the Offense

Defendant's conduct is serious not only because it exposed hundreds of people to potentially serious health consequences, but also because it directly undermined the integrity of the medical profession in this country.

On October 22, 2004, Congress enacted the Anabolic Steroid Control Act of 2004, Pub. L. No. 108-358. The Act was passed in response to increased media coverage and public awareness of the prevalence of performance enhancing drugs in professional and amateur sports. The Act provided for increased penalties for the unlawful use of anabolic steroids. While the Steroid Control Act of 2004 reflected Congress's sense that anabolic steroids present a public health danger, it still did not address the growing abuse of hGH, which by now is recognized as the new front of "designer drugs." The Sentencing Commission responded to the Bill's passage by revising and substantially strengthening the guidelines covering anabolic steroids. The Sentencing Commission's 2006 Steroids Report, portions of which are attached here as Exhibit 8, contained the following significant findings:

> First, steroids are now considered potentially addictive, with documented withdrawal symptoms.
> Second, steroids are primarily distributed through use of the Internet involving international sources.

Steroids Report at 21. The Report also included a summary of the potential health consequences associated with the abuse of steroids including "liver and skin disorders" and "increase[d] risk of serious infectious diseases associated with use of non-sterile injection equipment and procedures." Report at 23-24. Included in those risks were the psychiatric effects such as "homocidal rage, mania, delusions," commonly referred to as "roid rage." Id. The Report found

that there were over a million current and past users of anabolic steroids in the United States.

Although less widely reported, there have been various studies recently of the safety and efficacy of hGH in healthy adults. The "anti-aging" companies for which Ms. Santi wrote prescriptions touted hGH as a miracle "anti-aging" drug. Medical studies, however, do not support these contentions. Thus, for instance, the Annals of Internal Medicine published a "Systemic Review: The Safety and Efficacy of Growth Hormone in the Healthy Elderly," portions of which are attached here as Exhibit 9. The study found at best minor changes in body composition and a negligible reduction in cholesterol. There was no change in bone density and other lipid levels. On the other hand, healthy persons treated with hGH were "significantly more likely to experience soft tissue edema, arthralgias, carpal tunnel syndrome, and gynecomastia, and were somewhat more likely to experience the onset of diabetes militus. . . ." Review at 104. The study concluded that "controlled trials evaluating GH therapy in the healthy elderly is limited but suggests that it is associated with small changes in body composition and increased rates of adverse events. On the basis of this evidence, GH cannot be recommended as an antiaging therapy." Id.

But while the medical benefits of prescribing hGH to healthy adults are negligible at best, the profits associated with its distribution certainly are not. The evidence in this case shows that one vial of hGH sold for anywhere between \$90-\$135 per vial. See Exhibit 10. Based on information collected by the FDA in connection with this investigation and related investigations, it is believed that the pharmacies obtain the same quantity of hGH for as little as \$8 per vial. Thus, the profit-margins associated with the distribution of hGH are substantial. The ultimate losers are of course the customers, who not only suffer potential adverse health consequences,

but significant financial loss. Although the customers bear significant responsibility for their losses, it does not help that physicians, pharmacies, and clinics lend an air of medical legitimacy to this unlawful market. These so-called doctors abuse their position of trust in the community to pray on their customers for the sole purpose of financial gain.

In United States v. America v. James M. Shortt, 485 F.3d 243 (4th Cir. 2007), the Fourth Circuit upheld an upward departure to the sentence of a physician who prescribed steroids and hGH to NFL players. The Court cogently explained its view that the Guidelines did not properly account for the seriousness of the offense as follows:

> A doctor's illegal dispensing of steroids and human growth hormone has a particularly pernicious effect. In the name of enhancing athletic performance, a doctor dispensing steroids and human growth hormone exposes an athlete to numerous health risks, including extreme mood swings, liver and kidney tumors, liver and prostate cancer, heart attacks, high blood pressure, and infertility. See H.R. Rep. No. 108-461(I), at 5. The perversion of the doctor's professional responsibility to prescribe drugs for the health of his patients is at the core of the violation's seriousness.

Id. at 249-50.

In this case, Santi used a medical license and a DEA registration number – tools of the medical profession that signify to the public a certain level of expertise and responsibility – as tools for making $25 a script. She wrote prescription and provided for the maximum allowable refills on those prescription to individuals she never met. She had no idea whether they were cancer survivors (as some of her customers were), minors, athletes, or invalids. Indeed, she believed that they were "healthy" in her own words. Exhibit 7 at 24. One wonders, of course, why "healthy" men and women require controlled substances and prescription drugs.

C. Role in the Offense

The defendant, in comparing her financial gain to that of co-defendant Daniel McGlone, or to the owners of Signature Pharmacy, who are currently under indictment in New York, attempts to portray herself as a minor participant. In fact, there is no basis for that assertion. First, this scheme would not work without the willing participation of medical doctors like Santi. Certainly, she was not at the top of the pyramid, but she was an essential participant in the scheme. Second, Santi engaged in this conduct for over five years and worked for at least five different companies. A financial investigation completed in this case demonstrated that, while Santi earned about $25,000 from APG, her combined earnings in 2005-2006 from the various entities for which she worked exceeded $125,000. Exhibit 11. Third, Santi recruited Dr. Mariani to work for APG and Advance Therapy, thus expanding their business and exposing Dr. Mariani to criminal liability.

III. Conclusion

For the foregoing reasons, the government believes that a sentence of 40 months is a reasonable sentence in light of the various factors set forth in 18 U.S.C. §3553(b).

Respectfully Submitted,

THE UNITED STATES OF AMERICA

By its attorneys,

ROBERT CLARK CORRENTE
United States Attorney

ADI GOLDSTEIN
Assistant U.S. Attorney

CERTIFICATE OF SERVICE

On this 30th day of October, 2007, I caused the Government's Memorandum in Aid of Sentencing to be hand delivered to:

Edward C. Roy, Esq.
Federal Defenders Office
10 Weybosset Street, 3rd Floor
Providence, RI 02903

ADI GOLDSTEIN
Assistant U.S. Attorney
RI Bar #6701
U.S. Attorney's Office
50 Kennedy Plaza, 8th FL
Providence, RI 02903
Tel (401) 709-5000
Fax (401) 709-5001
email adi.goldstein@usdoj.gov