# 2006 Steroids Report

Prepared by
the Steroids Working Group
United States Sentencing Commission

March 2006

punishable by up to five years in prison with or without hard labor. He further advised that two states, Vermont and Alaska, had not scheduled anabolic steroids in any way as of the date of the hearing, but that Alaska had a bill in the legislature to address the issue. In addition, Mr. Collins indicated that with respect to dosages, the concept of tablets and cc's is irrelevant because users think in terms of milligrams, a potency measurement, with the important point being the milligram amount of the active ingredient.

Although Commission staff had ongoing and informative discussions with DOJ representatives about these and other issues, staff were unable to provide satisfactory responses to Commissioner questions about steroids offenses. In April 2005, Commissioners decided to table a vote on amending the guidelines for steroids offenses and instead conduct more research and update the Commission's 1990 Steroid Report.

To ensure that the Commission's work in this area was conducted as quickly as possible, the Commission sought and received emergency amendment authority from Congress to address steroids offenses outside its normal, year-long notice and comment cycle. Instead, the Commission sought a six-month review and promulgation period. On July 1, 2005, the Senate passed legislation, S.1368, granting the Commission emergency amendment authority to amend the sentencing guidelines, commentary, and policy statement to implement the Anabolic Steroid Control Act of 2004. [109] The House introduced companion legislation, H.R. 3020, but on September 22, 2005, it adopted the Senate bill. The bill became Pub. L. No. 109-76 on September 27, 2005. The Commission has until March 27, 2006, to promulgate an emergency amendment to the guidelines for steroids offenses. The emergency amendment is required to be re-promulgated as part of the Commission's package of regular amendments and submitted to Congress for its consideration on May 1, 2006, or else the emergency amendment will expire by November 1, 2006.

## IV. FINDINGS REGARDING STEROIDS OFFENSES TODAY

In the months since the enactment of the Anabolic Steroid Control Act of 2004, the Commission has been engaged in a number of activities geared toward implementing the directive contained in the Act and updating the Commission's 1990 Steroid Report. Specifically, on September 27, 2005, the Commission hosted a roundtable discussion that included experts from the scientific community, a government health agency, law enforcement, and the defense community.[110] Commission staff also attended congressional hearings related to steroids and Major League Baseball, met with congressional staff working on steroids issues, and worked with the Government Accountability Office (GAO) on its report on steroids penalties. The results of the Commission's work to update its 1990 Steroids Report is set forth in Part IV of this report.

---

[109] United States Parole Commission Extension and Sentencing Commission Authority Act of 2005, S. 1368, 109th Cong. (2005).

[110] A list of attendees and the questions covered by the roundtable are attached at Appendix A.

## A. The Commission's 1990 Steroids Report

In the 1990 Steroids Report, the Commission recognized Congress' growing concern for the health risks of illegal steroid use and its widespread abuse. The report found the following:

(1) Illegal steroid use involved using a number of steroids "stacked" together to manage potency and taken for specific "cycles" ranging from six to eight weeks.

(2) A body of scientific literature existed documenting the side effects of steroid use in various organ systems, and that those effects differed by gender of the user.

(3) Information provided by DEA, reflecting then current knowledge, indicated that steroids were not physically or psychologically addicting.

(4) Steroids differed somewhat from other controlled substances both in the array of types of steroids being criminalized and in the varying dosages available.

(5) Characteristics of steroid users were different from that of users of other controlled substances.

(6) Steroid traffickers could be roughly categorized as small (less than 10 customers), medium (10 to 20 customers), large (more than 20 customers), and huge wholesalers ("with ongoing businesses grossing hundreds of thousands of dollars").

(7) Penalties for steroid offenses had typically resulted in sentences of probation.

(8) Steroid offenses were not covered by the sentencing guidelines.

The DOJ recommended a sentencing scheme that was considered by the Commission but found to be difficult to implement within the existing drug trafficking guidelines.[111] The Commission modified the DOJ's suggested method and created a more severe penalty structure that was consistent with the drug guideline.

---

[111] Although the drug guideline, USSG §2D1.1, currently measures all Schedule III drugs in units, the guidelines did not measure Schedule III substances in units when the Commission's 1991 amendment to §2D1.1, responding to the 1990 Act, made steroids the only Schedule III substance using the unit formula. The rest of the Schedule III substances had individual conversion ratios used to calculate the substances' weight into grams of marijuana. In 1995, the Commission changed the weight conversion system to a unit system for the rest of the Schedule III substances and Schedule I and II depressants. At that time, the Commission established the current definition of one pill equaling one unit while maintaining the existing penalty for steroids, thus creating a distinction between steroid penalties from penalties for other Schedule III substances.

## B. Steroids Today

Information regarding the pattern of use, prevalence, and harms associated with steroid abuse is very similar in 2006 to the information available to the Commission in 1990 with two major differences:

> First, steroids are now considered potentially addictive, with documented withdrawal symptoms.
>
> Second, steroids are primarily distributed through use of the Internet involving international sources.

Additionally, in 1990, one-third of illicitly used steroids were diverted from legitimate sources in the United States. Discussion elicited at the September 27, 2005, roundtable discussion suggested that by 2005, illegal diversion represented a very small proportion of illegal steroid distribution.

### 1. Prevalence

In order to gather data on the prevalence of steroid abuse, the Commission staff conducted a review of available literature and surveys. The results of this research are outlined below.

Yersalis, et al., (1993) reported steroid use in the general population based upon findings from the 1991 National Household Survey on Drug Abuse.[112] Estimates from the survey indicated that there were 1 million current or former users of steroids in the United States with more than 300,000 persons using in the year prior to the survey.[113] More recently, NIDA, noting in its 2000 publication the scarcity of recent data on adult use, estimated that "hundreds of thousands of people aged 18 or older abuse anabolic steroids at least once a year" [114]

---

[112] C. E. Yersalis, et al., *Anabolic-Androgenic Steroid Use in the United States*, 270 Journal of the American Medical Assoc. 10, 1217-1221 (September 8, 1993).

[113] A current user is defined as someone who has used a drug in the 30 days prior to taking the questionnaire and a former user is someone who reports using a drug in their lifetime.

[114] These estimates are approximately the same as reported from the 1994 National Household Survey on Drug Abuse, the last year in which questions regarding steroid use were included. In 1994 the estimate for lifetime prevalence was 1,084,000 with an estimated 312,000 users in the past year. U.S. Department of Health and Human Services, Public Health Service, SAMHSA, Office of Applied Studies, Advance Report Number 10, Preliminary Estimates from the 1994 National Household Survey on Drug Abuse, *September 1995*, Rockville, MD 20857. Available at: http://www.oas.samhsa.gov/ftp/nhsda/ar10all.wpd

Congress has expressed its concern with steroid abuse among youth since its deliberations in 1988 leading up to making steroid distribution a felony.[115] This concern was most recently reiterated in the Anabolic Steroid Control Act of 2004. The ongoing Monitoring the Future Survey (MTFS) of Grades 8, 10, and 12 provides a window into drug using behaviors and attitudes in this population.[116]. Data from this 2005 survey indicate that the percentage of eighth, tenth and twelfth graders using steroids in the past year is 1.1 percent, 1.3 percent, and 1.5 percent, respectively (Table 1). The prevalence among tenth and twelfth graders has declined from prior years, especially among twelfth graders who reported a 2.5 percent prevalence rate in 2004. However, while there has been a trending downward generally in the annual prevalence of steroid use in these grades, extrapolating downward from eighth grade to the corresponding tenth grade (for example, the eighth-grade class of 1991 became the tenth-grade class of 1993) and then further to the corresponding twelfth-grade class (which had become the twelfth-grade class of 1995) indicates that use typically remains steady or rises with age. The recent downturn among twelfth graders in 2005 (from the 1.7 percent of tenth graders in 2003) is insufficient to determine if this generally long-standing pattern is changing.[117]

**Table 2**
**Trend in Annual Percentage of Students Reporting Steroid Use in Eighth, Tenth, And Twelfth Grade[118]**

| | 1991 | 1992 | 1993 | 1994 | 1995 | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 8th | 1.0 | 1.1 | 0.9 | 1.2 | 1.0 | 0.9 | 1.0 | 1.2 | 1.7 | 1.7 | 1.6 | 1.5 | 1.4 | 1.1 | 1.1 |
| 10th | 1.1 | 1.1 | 1.0 | 1.1 | 1.2 | 1.2 | 1.2 | 1.2 | 1.7 | 2.2 | 2.1 | 2.2 | 1.7 | 1.5 | 1.3 |
| 12th | 1.4 | 1.1 | 1.2 | 1.3 | 1.5 | 1.4 | 1.4 | 1.7 | 1.8 | 1.7 | 2.4 | 2.5 | 2.1 | 2.5 | 1.5 |

Source: Monitoring the Future, University of Michigan.

The MTF survey also reports on attitudes and perceptions of drugs among these student samples. In 2005, 56.8 percent of twelfth graders in the sample reported that taking steroids is a "great risk." Responses to this have hovered in the mid to upper fiftieth percentile for several years but is lower than its peak level (70.7%) reported in 1992. Also in the 2005 sample, 39.7

---

[115] Hughes, *supra* note 15.

[116] Monitoring The Future, University of Michigan, Monitoring The Future Survey (2005), available at: http://monitoringthefuture.org/data/data/html.

[117] *Id.* Data from the 2005 survey further indicate that the percentage of eighth, tenth and twelfth graders using heroin in the past year is 0.8 percent, 0.9 percent, and 0.8 percent, respectively; cocaine usage in the last year is 2.2 percent, 3.5 percent, and 5.1 percent, respectively; and marijuana usage in the last year is 12.2 percent, 26.6 percent, and 33.6 percent, respectively.

[118] *Id.*

percent of twelfth graders reported that it would be "fairly easy" or "very easy" to obtain steroids. This represents the first time the response has been below forty percent and is seven percentage points below the peak of 46.8 percent also reported in 1992.[119]

Steroid abuse is often regarded as being limited to athletes motivated to use steroids for their potential to improve performance. However, as indicated by testimony received at the Commission last year, reasons for steroid abuse are not limited to enhanced athletic performance but also include use for purely cosmetic purposes.[120] CBS News recently reported on steroid abuse by adolescent girls, two-thirds of whom were using steroids for cosmetic purposes ("to get a muscular or cut look").[121] Testimony before the House Committee on Government Reform also indicated that steroids are used by some teenage girls for cosmetic purposes, though it is unclear how widespread such use is.[122]

### 2. Harmful Effects

Supraphysiologic[123] doses of anabolic steroids produce an array of potential health consequences, some reversible at discontinuation and others irreversible, that differ for men and women. These consequences involve the hormonal, musculoskeletal, and cardiovascular systems. Steroid abuse may also cause liver and skin disorders and may increase risk of serious infectious diseases associated with use of non-sterile injection equipment and procedures.[124] A good summary of these health related consequences is available from NIDA and is reproduced at Figure 1.

---

[119] MTFS website tables, *supra* note 115. See also the GAO Report on Steroids which discusses the ready availability of steroids through the Internet. GAO, Report #GAO-06-243R (Nov. 3, 2005). Available at: http://www.gao.gov/new.items/d06243r.pdf.

[120] Testimony of Rick Collins before the United States Sentencing Commission, April 12, 2005. Available at: http://www.ussc.gov/hearings/04_12_05/Collins.pdf

[121] CBS News, Steroids: Not Just a Guy Thing, April 27, 2005. Available at: http://www.cbsnews.com/stories/2005/04/27/earlyshow/health/main691201.shtml

[122] San Francisco Chronicle, Many Teenage Girls Abuse Steroids, Lawmakers Told, June 16, 2005. Available at: http://www.sfgate.com/cgi-bin/article.cgi?f=/c/a/2005/06/16/MNGAUD9H1G1.DTL.

[123] The American Heritage Stedman's Medical Dictionary su·pra·phys·i·o·log·ic (spr-fz-ljk) or supraphysiological (-kl) *adj.* **1.** Indicating a dose that is larger or more potent than would occur naturally, as of a chemical agent that mimics a hormone. **2.** Of or relating to the physiological effects of such a dose. The American Heritage Stedman's Medical Dictionary, 2nd ed., Houghton Mifflin Company, copyright 2004.

[124] NIDA, *supra* note 9; *see also* Brower, *supra* note 9, and Hall, *supra* note 10.

Additionally, various psychiatric disorders are also associated with the abuse of steroids.[125] Pope and Katz report that "convincing data now exist to suggest AASs can produce prominent psychiatric effects in some individuals (347) . . . [it is important to note that] . . . psychiatric responses to AASs are nonuniform: a majority of users exhibit little or no psychiatric change, whereas a minority exhibit prominent and sometimes severe psychiatric effects (342)."[126]

**Figure 1**

According to NIDA's research report on anabolic steroid abuse, the following potential health consequences of anabolic steroid abuse are listed:[127]

| | | |
|---|---|---|
| **Hormonal System**<br>In Men:<br>• infertility<br>• breast development<br>• shrinking of the testicles<br>In Women:<br>• enlargement of the clitoris<br>• excessive growth of body hair<br>In Both Sexes:<br>• male-pattern baldness | **Musculoskeletal System**<br>_ short stature<br>_ tendon rupture | **Skin**<br>_ acne and cysts<br>_ oily scalp |
| | **Cardiovascular System**<br>_ heart attacks<br>_ enlargement of the heart's left ventricle | **Infection**<br>_ HIV/AIDS<br>_ hepatitis |
| | **Liver**<br>_ cancer<br>_ peliosis hepatis | **Psychiatric Effects**<br>_ homicidal rage<br>_ mania<br>_ delusions |

[125] *Id.*

[126] Pope & Katz, *supra* note 9. Others have also reported that only an extremely small proportion of users experience significant psychological symptoms (including violent behavior) associated with steroid abuse and note that prior psychiatric history, genetics, environment, and expectations may influence these results in an unknown manner. M. S. Bahrke et al., *Psychological and Behavioural Effects of Endogenous Testosterone and Anabolic-Androgenic Steroids*, 22(6) Sports Med. 367-390 (Dec. 1996). .

[127] National Institute on Drug Abuse, Research Report Series, *Anabolic Steroid Abuse*, p. 5 (revised 2000). Available at: http://www.nida.nih.gov.

### 3. Abuse/Dependence/Withdrawal

The Commission's 1990 Steroids Report stated that information from DEA at that time indicated that steroids were not addictive (a position endorsed by the American Medical Association). That report indicates that others had proposed a theory of steroid use that included the potential for addiction.[128]

More recent information provided by NIDA in its 2000 update of steroid abuse indicates that an "undetermined" proportion of steroid users become addicted - exhibiting behaviors (*e.g.*, drug seeking, continuation of use despite consequences) identical to addiction to other drugs of abuse.[129] The information also indicates that some abusers experience withdrawal symptoms "such as mood swings, fatigue, restlessness, loss of appetite, insomnia, reduced sex drive, and the desire to take more steroids"[130]

A theoretical model for steroid addiction was recently proposed by Kirk J. Brower which attempts to explain the development of addiction from substances that do not generally provide the same intoxicating rewards to its user as other controlled substances.[131] Because of the

---

[128] This report included early work by Brower and others on the hypothetical addictive potential of anabolic androgenic steroids but appears to have agreed with the conclusion of DEA that steroids were not physically or psychologically addictive. This finding also appears to conflict with the finding of the Senate Committee of the Judiciary in 1989 when it was considering classifying steroids as a Schedule II substance.

[129] Addiction is "a chronic, relapsing disease, characterized by compulsive drug seeking and use, and by neurochemical and molecular changes in the brain." Heroin users spend increasingly more time and energy getting and using the drug and the drugs change their brains and behavior. Methamphetamine users exhibit symptoms which include violent behavior, anxiety, confusion, and insomnia, and can also exhibit psychotic symptoms including paranoia, auditory hallucinations, mood disturbances and delusions. See National Institute on Drug Abuse, NIH Pub. No. 05-4165, *Heroin Abuse and Addiction* (May 2005); National Institute on Drug Abuse, NIH Pub. No. 02-4210, *Methamphetamine Abuse and Addiction* (January 2002).

[130] NIDA, *supra* note 9, at 6. Symptoms of withdrawal for heroin users is described as occurring "within a few hours after the last time the drug is taken" and include "restlessness, muscle and bone pain, insomnia, diarrhea, vomiting, cold flashes with good bumps ("cold turkey"), and leg movements. NIDA reports that although there are not physical manifestations of a withdrawal syndrome upon disuse of methamphetamine, "there are several symptoms that occur when a chronic user stops taking the drug" including depression, anxiety, fatigue, paranoia, aggression, and an intense craving for the drug." See NIDA's reports on *Heroin Abuse and Addiction* and *Methamphetamine Abuse and Addiction*, *supra* note 128.

[131] Brower, *supra* note 9.

differences between the action of steroids compared to other drugs of abuse a two-stage model of addiction is theorized. This theory suggests that initially the steroid's reward for the user is experienced in the muscle growth associated with its use. However, at a later time, perhaps because of the very large dosages associated with illicit use, a brain based reward "similar to other drugs of abuse" is experienced.[132] It has also been reported that "[t]he reinforcing effects [reward experienced by the user] of steroids takes much longer to develop and therefore are more resistant to extinction [breaking the habit]."[133]

### 4. Steroids as Gateway Drugs

There is some evidence indicating that use of steroids may be associated with the use of other drugs of abuse and may serve, for some users, as a "gateway"/introductory drug to use of other controlled substances.

Two older surveys of high school students found that use of steroids is associated with the presence of other risk behaviors generally (such as drinking and driving, engaging in unprotected sex, carrying a gun, fighting, etc),[134] and with other illegal drug use specifically,[135] leading one researcher (Middleman) to conclude that adolescent steroid use is part of a more general "risk behavior syndrome."[136]

Consistent with the above findings, a recent review of the scientific literature on steroid use reports that "[t]he immersion [of steroid users] in the drug subculture [to obtain drugs or equipment, to learn how to use them, to learn how to hide and pay for their steroids] often leads to the abuse of other substances."[137] More recent research on drug users in treatment for drug abuse other than steroid abuse found that an unexpected proportion (13%) reported prior steroid use. The authors conclude that steroid use may be under-recognized in drug treatment populations, especially those with opioid dependance. They also conclude that for some of these users, the steroid use may serve as a "gateway" to abuse of other controlled substances.[138]

---

[132] *Id.* at 381.

[133] Scott Lukas, *SE CNS Effects and Abuse Liability of Anabolic Androgenic Steroids*, 36 Annu. Rev. Toxicol. 333-57 (1996).

[134] A. B. Middleman, et al., *High-Risk Behaviors Among High School Students in Massachusetts Who Use Anabolic Steroids*, 96 Pediatrics 268-272 (1995).

[135] R. H. DuRant et al., *Anabolic-Steroid Use, Strength Training, and Multiple Drug Use Among Adolescents in the United States.* 96 Pediatrics 23-28 (1995).

[136] Middleman, et al., *supra* note 133.

[137] Hall, *supra* note 10, at 553.

[138] G. Kanayama, et al., *Past Anabolic-Androgenic Steroid Use Among Men Admitted for Substance Abuse Treatment: An Underrecognized Problem.* 64 J. Clin. Psychiatry 2, 156-

Typically the "gateway" concept refers to a drug user moving on to other types of drugs after introduction by the "gateway" drug. A recent report by the GAO[139] on steroids suggests a new meaning to this term. The GAO reports that steroid distributors use steroid sales to determine if the buyers are law enforcement officers. If satisfied that buyers are "legitimate," they then may offer "narcotics, such as cocaine," for sale.[140] This presents a novel method for drug distributors outside the United States to "test the waters" by distributing a drug, legal in the seller's country, before offering drugs classified internationally as illegal to distribute.

### 5. Steroids Trafficking

The current DEA Fact Sheet on steroids indicates that the primary source of illegal steroids is through purchases via the Internet. The next most common source is from steroids being smuggled into the United States from Mexico and Europe where steroids are often available without a prescription.[141] This is consistent with findings from the 2005 GAO Steroids Report.[142]

In discussions with Commission staff, law enforcement officials have indicated that they consider a medium size trafficker as someone who distributes a complete cycle to 10 customers. A person is considered a high-level trafficker if they distribute one complete cycle to 30 customers. This is similar to trafficking information provided by DOJ during the 1990 deliberations. At that time, having fewer than 10 customers was indicative of a small level trafficker, a medium distributer had between 10 and 20 customers, and a large trafficker was identified as having more than 20 customers.

---

160 (February 2003).

[139] *See* GAO Report, *supra* note 116, at 1.

[140] *Id.* at 6.

[141] DEA Briefs & Background, *Drugs and Drug Abuse*, Drug Descriptions, Steroid Factsheet. Available at: http://www.usdoj.gov/dea/concern/steroids_factsheet.html.

[142] The overall findings of the 2005 GAO Steroids Report are not inconsistent with Commission research. That report found, for example, that: (1) steroids come from abroad; (2) use of the Internet for steroids trafficking is widespread; (3) the sheer volume of international shipping presents enforcement challenges; and (4) shipment of bulk powder steroids is an emerging problem. This last finding is of particular interest because this form of the drug, as well as others, also presents a sentencing problem. Presently, the guidelines determine the penalty level of steroid offenses based upon the number of pills or the volume of liquid involved in the offense. The guidelines do not provide guidance to the courts on determination of penalties for other forms of steroids such as the bulk powders described in this report as well as other forms that steroids may take (*e.g.*, topical creams, patches, etc).

### 6. Commission Data Analysis

Between 2001 and 2005, a total of 46 offenders were sentenced under the drug trafficking guideline for steroid trafficking offenses. The number of cases received during each period of time is as follows: (1) 11 cases in Fiscal Year 2001; (2) 8 cases in Fiscal Year 2002; (3) 9 cases in Fiscal Year 2003; (4) 8 cases in Fiscal Year 2004 pre-*Blakely*;[143] and (5) 10 cases in Fiscal Year 2005 post-*Booker*.[144]

A total of 24 federal judicial districts were involved with these cases. The Eastern District of New York, with 6 cases, and the Western District of Texas, with 5 cases, reported the most cases over this period.

Offenders were male (44 of the 45 cases for which gender was known) and mostly U.S. citizens (80.0%, n=36). Half (n=23) were under thirty years of age. Three offenders were over 50 years of age and 68.9 percent had some college education or had completed college.

Base offense levels assigned under USSG §2D1.1 ranged from level 6 to level 20 but over half (56.5%, n=26) of the cases had base offense levels of 6 (n=14) or 8 (n=12). Weapon involvement in the offense was rare, as only 3 offenders (6.5%) received an enhancement, either statutorily or under the guidelines, for this conduct. Penalty adjustments in Chapter Three of the guidelines rarely were applied, other than 3E1.1 (Acceptance of Responsibility). Acceptance of responsibility was credited in 41 (89.1%) of the cases. Most offenders (78.3%, n=36) were in Criminal History Category I, indicating minimal or no prior criminal justice involvement.

Most offenders (72.7%, n=32) were sentenced within the guideline range, one case received an upward departure, three received a downward departure, and eight (18.2%) received a downward departure under USSG §5K1.1 for providing substantial assistance to authorities. Over half (56.5%, n=26) of these cases received a probation-only sentence. Fourteen of these

---

[143] The pre-*Blakely* period refers to that portion of Fiscal Year 2004 from October 1, 2003, until June 24, 2004, the date of the Supreme Court decision in *Blakely v. Washington*, 542 U.S. 296 (2004). *Blakely* invalidated the Washington State guideline sentencing scheme because facts enhancing the defendant's sentence under that scheme were not put before the jury. The impact of *Blakely* on the federal scheme is difficult to measure, which may produce unreliable results in the data. Accordingly, this analysis uses only that portion of Fiscal Year 2004 data which predates the *Blakely* decision.

[144] The post-*Booker* period refers to that portion of Fiscal Year 2005 from January 13, 2005, the date of the U.S. Supreme Court decision in *United States v. Booker*, 543 U.S. 220 (2005), through September 30, 2003, the end of the fiscal year. In *United States v. Booker*, the Supreme Court applied the ruling in *Blakely* to the federal guidelines. For the reasons stated in footnote 138, *supra*, this analysis uses only that portion of Fiscal Year 2005 data which postdates the *Blakely* decision.

cases received a prison sentence with an average sentence of 14.5 months (median sentence is 6 months).

## IV. CONCLUSION

The Commission appreciates congressional concern about the dangers associated with steroids offenses and the need for the penalties imposed to reflect the seriousness of these offenses and the need to deter anabolic steroid trafficking and abuse. In implementing the congressional directive to the Commission in the Anabolic Steroid Control Act of 2004 to consider increasing penalties for such offenses, the Commission undertook to update its previous research on steroids offenses and penalty structures.

This additional research revealed that steroid offenses are characterized by the same patterns of use, prevalence, and harms associated with steroid use as was the case in 1990, when the Commission first studied steroid offenses. The research also revealed, however, that steroids are now considered potentially addictive, with documented withdrawal symptoms, and are capable of being more widely distributed than before through the use of the Internet and involve international sources.

This information is important to the Commission's consideration of the appropriate penalties for steroids offenses, as it implements the directive in the Anabolic Steroid Control Act of 2004 and also ensures, pursuant to 28 U.S.C. § 991(b), that such penalties promote the purposes of sentencing as set forth in 18 U.S.C. § 3553(a).